## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF        )
                                      )          05 - 0 2 9 9 M - 0 1
2711 Q Street, S.E., #101             )
Washington, D.C.                      )

### AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

#### I.  INTRODUCTION AND EXPERIENCE

I, Timothy J. Ervin, Special Agent (SA) with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C., (hereinafter the "affiant") being duly sworn, depose and state as follows:

1.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I have been an SA with the FBI since 1991. I am currently assigned to a Drug Unit. From 1996 to 2002, and beginning again in October, 2003, I have been working on federal narcotics investigations and have previously participated in several

1

investigations which led to the arrest and conviction of narcotics distributors. Prior to 1996, I was assigned to a counter-intelligence unit in the Federal Bureau of Investigation. Since 1991, I received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white collar crimes, search warrant applications, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques:  interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband.

2.      Based on the experience described in the paragraph above, my personal participation in this and other investigations involving illegal drug activity, and extensive conversations with other Federal Agents and police officers who are knowledgeable of drug-trafficking investigations, your affiant knows that:

(a)      Individuals who traffic in illegal controlled substances maintain books, records, receipts, notes, ledgers, money orders, bank records, currency, safe deposit box keys, telephone calling cards, address books, telephone numbers, pager numbers, photographs and other

2

papers relating to the transportation, storage, order, sale and distribution of controlled substances. Also, these items are generally maintained in the trafficker's residence, or residences of associates, friends or relatives, in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses, or in business locations with which the trafficker is associated and where the trafficker has ready access to these items. It is also common practice for drug traffickers to utilize safes within their premises to safeguard and facilitate the concealment of the above described items;

(b)     Drug traffickers routinely conceal in their residence or the residences of family members, friends and associates, as well as their business locations, and/or in places used by drug traffickers to conduct their drug distribution activity (such as automobiles, stash houses or safe houses) large quantities of currency, financial instruments, precious metals, jewelry and other items of value. which are typically the proceeds of illegal controlled substance transactions;

(c)     It is also common for drug traffickers to secrete contraband related to their drug trafficking activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, strainers. microwave ovens. pots, dishes and other containers for preparing heroin, cocaine and other controlled substances for distribution, at their residence, or the residences of family members. friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

(d)     Drug traffickers commonly maintain telephone number and address books, or papers which reflect names. addresses and/or telephone numbers for other associates of their illegal organization. These individuals often utilize telephones, cellular telephones and pagers to

3

maintain contact with other associates of their illegal businesses, and these telephone records, bills and pager numbers are often found in their places of residence, or the residences of family members, friends or associates, in their business locations, or in places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

(e)    Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband.  These photographs are usually maintained in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

(f)    Drug traffickers often own, possess and use weapons to facilitate their illegal drug trafficking activities.  These weapons are most often secreted in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses; and

(g)    Drug traffickers often use safe deposit boxes to amass, retain and conceal their illegal proceeds to avoid detection.  Deposits to bank accounts create an accessible record (or paper trail) of deposits, withdrawal and transfer of funds and banks are required to report cash transactions in excess of $10,000 to the Internal Revenue Service (IRS).  Safe deposit boxes, which are readily accessible to drug traffickers, provide a "safe haven" for illegal drug proceeds where there is no such accounting.

(h)     Drug traffickers often use coded language and terms to disguise conversations about their drug activities.  Drug traffickers also frequently use electronic paging devices commonly known as "pagers" or "beepers" to communicate with co-conspirators.  A common technique among drug traffickers is to transmit pre-arranged numerical codes to the pager to communicate information, such as price or quantity of drugs, to the individual in possession of the pager.

(i)     Computer hardware, software, documentation, passwords, data security devices. and data may be integral tools of narcotics trafficking and money laundering and may constitute the means of committing these and other crimes.  Traffickers often keep computers and computer related equipment in their home and utilize the equipment to keep detailed records of their narcotics transactions.  Various computer software programs originally designed for balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking.  In addition, because information can be easily hidden in a computer in a manner that would prevent immediate identification (for example, coded file names or encryption) and because computer storage devices can be used to store the equivalent of thousands of pages of information (which could take weeks or months to sort), it is often necessary to seize an entire computer system so that a qualified computer expert can accurately retrieve the system's data in a controlled laboratory setting.

3.     This affidavit is based in part on physical surveillance, and in part on the controlled purchase of narcotics.  This affidavit does not contain all of the information known to me regarding this investigation.  Your affiant has included in this affidavit facts which he believes are sufficient to support a probable cause finding for the issuance of the requested search warrant.

4.      As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other Special Agents of the FBI, I am familiar with all aspects of this investigation.  On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show  there is probable cause to believe the fruits, evidence, and instrumentalities of violations of the following federal offense, among others, are presently to be found at 2711 Q Street, S.E., #101, Washington, D.C.:

> Distribution of controlled substances, in violations of Title 21, United States Code § 841(a)(1) and Conspiracy to distribute controlled substances, in violation of Title 21 United States Code, § 846.

## II.     PROPERTY TO BE SEIZED

1.      Heroin, cutting agents, packaging materials including scales and other paraphernalia used in diluting and packaging heroin for distribution.

2.      Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular heroin, or other controlled substances.

3.      Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers.

4.      Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items

6

evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money.

5.      United States currency, precious metals. jewelry and financial instruments, stocks and bonds.

6.      Photographs, in particular photographs of co-conspirators, assets and/or controlled substances.

7.      Weapons. including but not limited to revolvers, semi-automatic pistols, rifles and ammunition.

8.      Cellular telephones, pagers and records and receipts reflecting their ownership and use.

9.      Safes. both combination and key type. and their contents.

10.     Indicia of occupancy, residence and/or ownership of the premises described herein, including. but not limited to utility and telephone bills, canceled envelopes and keys.

11.     Any and all electronic data processing and storage devices, computers and computer systems, keyboards, Central Processing Units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation. operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.

### III.    <u>DESCRIPTION OF PREMISES</u>

5.      This affidavit is respectfully submitted in support of an application for a warrant to search and seize evidence from the property commonly known as 2711 Q Street. S.E.. #101, Washington, D.C. The property is further described as a brown brick. three story apartment building.

7

The numerals "2711" appear in black on the front of the building. The main entrance door is brown in color. Apartment 101 is on the first floor of the building.

## IV.  THE INVESTIGATION

6.     This investigation was initiated by the FBI in December, 2004, based upon information received from a reliable and confidential source (hereinafter referred to as "CW-1"), who has provided truthful information on numerous occasions about significant drug traffickers and has never provided any false information. On February 4, 2005, CW-1 arranged to meet with ROBERT ALONZO TINNEY to purchase 50 grams of heroin. CW-1 had arranged the transaction with TINNEY via cellular telephone call to 202-374-3389. That number is subscribed to Robert Tinney, 123 16th Street, S.E., Washington, D.C. During this conversation, CW-1 and TINNEY agreed to meet later that day for a narcotics transaction. Later on February 4, 2005, CW-1 met with TINNEY and made a controlled purchase of approximately 50 grams of heroin for $4,250. The transaction took place at a Shell gas station at 25th Street & Pennsylvania Avenue, S.E., WDC. That location is only a few blocks from 2711 Q Street, S.E. This transaction was recorded (audio and video). TINNEY arrived for the transaction driving a 1997 green Chevrolet Blazer with Maryland license plate 130M156. That vehicle is registered to ROBERT ALONZA TINNEY, 1635 Taylor Avenue, Fort Washington, Maryland.

7.     The material purchased by CW-1 was later analyzed by the DEA laboratory and found to be a substance containing heroin with a strength of 25 percent.

8.     On March 3, 2005, CW-1 arranged a second meeting with ROBERT ALONZO TINNEY to purchase 50 grams of heroin. CW-1 had arranged the transaction with TINNEY via

8

cellular telephone call to 202-374-3389. During this conversation, CW-1 and TINNEY agreed to meet later that day for a narcotics transaction. Later on March 3, 2005, CW-1 met with TINNEY and made a controlled purchase of approximately 50 grams of heroin for $4,250. That transaction took place in Northeast, Washington, D.C. The transaction was again recorded (audio and video). TINNEY arrived again in the 1997 green Chevrolet Blazer with Maryland license plate 130M156.

9.    The material purchased by CW-1 was later analyzed by the DEA laboratory and found to be a substance containing heroin with a strength of 71 percent.

10.    After the transaction on March 3, 2005, surveillance observed TINNEY travel to the 2700 block of Q Street, S.E., Washington, D.C., and park his vehicle. A short time later, TINNEY was observed exiting 2711 Q Street, S.E., Washington. D.C.

11.    Surveillance conducted by your affiant and other agents has observed the green Chevrolet Blazer with Maryland tag 130M156 parked in front of 2711 Q Street, S.E., Washington, D.C. on several occasions. On March 21, 2005 the vehicle was observed on the curb in front of 2711 Q Street, S.E., Washington, D.C. TINNEY exited the main door of 2711 and drove away in the green Chevrolet Blazer. On at least two other occasions (April 7, 2005 and April 15, 2005), the vehicle has been observed parked in the same area of the 2700 block of Q Street, S.E., Washington, D.C.

12.    On May 10, 2005, CW-1 met with TINNEY at the corner of Malcolm X Avenue and Martin Luther King Jr. Avenue, S.E., Washington. D.C. TINNEY advised CW-1 that he had just recently been supplied with 200 grams of heroin HCL by his supplier. TINNEY also stated that he

9

would sell CW-1 50 grams of heroin HCL on 05/11/05. CW-1 advised that the cost for the 50 grams from TINNEY would be $85 per gram.

13.    Subpoenaed telephone records revealed the residential telephone number at 2711 Q Street, S.E., Apt. 101, Washington, D.C., is 202-581-8420.    The subscriber to that telephone is ROBERT TINNEY.    On January 21, 2005, a pen register was initiated on TINNEY's cellular telephone, 202-374-3389.  A review of that pen register determined that during the period 1/27/05 - 4/16/05, there have been 16 calls between TINNEY's cellular telephone and the residential telephone at 2711 Q Street, S.E., apartment 101 (202-581-8420).

14.    On May 19, 2005, the CW met with TINNEY and made arrangements for a narcotics transaction in which TINNEY would sell 30 grams of heroin to the CW.  Following the meeting law enforcement agents followed TINNEY to the premises at 2711 Q Street, S.E., Apt. 101, Washington, D.C.  TINNEY entered the premises and spent approximately 10 minutes inside before driving to the intersection of Martin Luther King Avenue and Malcolm X Avenue in southeast Washington, D.C., where he entered the vehicle occupied by the CW.  In the vehicle, which was equipped with a hidden video recorder, TINNEY distributed approximately 30 grams of heroin to the CW in exchange for $3,000. Tinney left the vehicle and remained under law enforcement surveillance until he was arrested.  At no time did he re-enter the premises at 2711 Q Street, S.E., Apt. 101, Washington, D.C. The substance TINNEY gave to the CW was field tested positive for the presence of heroin.

15.    As demonstrated through the FBI investigation, there is probable cause to establish

that: ROBERT ALONZO TINNEY is a distributor of heroin, and TINNEY resides at 2711 Q Street,

S.E, Apt. 101, Washington, D.C.

VI.    **CONCLUSION**

16.    Your affiant asserts that the facts contained within this affidavit establish probable

cause to believe that the contraband, including heroin, fruits, evidence and instrumentalities of

violations of the laws of the United States, specifically 21 U.S.C. §§ 841(a)(1) and 21 U.S.C. §§ 846,

are presently to be found in the above-listed premises, including items listed in Schedule A attached

to this affidavit and incorporated herein. Therefore, in light of the circumstances and the evidence

adduced from this investigation, your affiant respectfully submits that probable cause exists for the

issuance of a search warrant for the location/address listed above.

TIMOTHY J. ERVIN, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this MAY 1 9 2005 day of May 2005.

ALAN KAY
United States Magistrate Judge
for the District of Columbia

**ALAN KAY
U.S. MAGISTRATE JUDGE**

11